**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**
**CENTRAL DIVISION**

| | |
|---|---|
| NAOMI KEHL,<br><br>    Plaintiff,<br><br> vs.<br><br>TONY LEBLANC and WESTMINSTER COLLEGE,<br><br>   Defendants. | Hon. _____<br><br>Civil Action No.: _____<br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

## <u>COMPLAINT AND JURY DEMAND</u>

*This action alleges violations of Title IX and the denial of equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States. This cause arises from a collegiate women's soccer coach's grossly permissive attitude towards, and often, direct participation in, wildly inappropriate sexual harassment directed towards his young female players as an "initiation ritual" to partake in the sport. Additionally, this cause arises from the college's own deliberately indifferent response to this vile and ongoing sexual harassment. Finally, this cause also arises out of the retaliatory actions perpetrated upon Plaintiff by her coach as a direct result of Plaintiff speaking out against his wildly inappropriate and sexually harassing conduct.*

  Plaintiff, NAOMI KEHL, by and through her attorneys, Lento Law Group, P.C., and by way of Complaint, brings this action for damages and other legal and equitable relief against Defendants TONY LEBLANC and WESTMINSTER COLLEGE (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1.      The United States is undergoing an epidemic of sexual harassment and abuse of student[1] and professional[2] athletes by people charged with their care, coaching and responsibility.

2.      Given the fear, shame, confusion, and vulnerability victims of sexual harassment and abuse experience, and the threat of retaliation if they report the misconduct, the violations remain largely hidden while the perpetrators continue their abuse, and the number of victims increases.

3.      The true breadth of this epidemic is only beginning to be exposed as courageous young athletes come forward.

4.      Victims of sexual harassment and abuse often suffer extreme mental, emotional, and psychological harm, which negatively affects their lives, scholarship, and athletic performance.

5.      Utah student athletes are not immune to sexual abuse and harassment suffered at the hands of those charged with their care, coaching, supervision, and responsibility, and this matter arises from just such conduct.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (collectively, "Title IX"), as more fully set forth herein.

---

[1] The most notorious example in recent history is the USA Gymnastics sex abuse scandal.  *See*, *e.g*., https://en.wikipedia.org/wiki/USA_Gymnastics_sex_abuse_scandal

[2] This *New York Times* article, N.W.S.L, Reeling in Scandal, Cancels a Weekend of Games, discusses sex abuse in U.S. women's soccer.  https://www.nytimes.com/2021/10/01/sports/soccer/nwsl-abuse-scandal.html?referringSource=articleShare

7.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331.

8.     This Court also has supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367(a), as such claims are so closely related to the Title IX claims that they form part of the same case or controversy and arise out of a common nucleus of operative fact.

9.     Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) & (b)(2), as, upon information and belief, all Defendants reside in this district and the events giving rise to Plaintiff's claims as complained of herein occurred within this district.

## PARTIES

10.    At all times relevant hereto, Plaintiff NAOMI KEHL, is an adult resident citizen of the County of Salt Lake, State of Utah, with a residential address for service of process being 12803 S. Ellerbeck Lane, Draper, Utah 84020.

11.    At all times relevant hereto, Defendant TONY LEBLANC is, upon information and belief, an adult resident citizen of the County of Weber, State of Utah, with a residential address for service of process believed to be 952 40th Street, Ogden, Utah 84403.

12.    At all times relevant hereto, Defendant WESTMINSTER COLLEGE is a private university chartered in the State of Utah as an institution of higher education with its principal place of business in Salt Lake County, Utah.

## APPLICABLE LAW AND POLICY

Applicable Federal Law

13.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a),

states in relevant part that:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under any education
> program or activity receiving Federal financial
> assistance[…]

14.    Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R.

Part 106.

15.    Specifically, 34 C.F.R. § 106.2(g) defines "Federal financial assistance" as:

> […] any of the following, when authorized or extended
> under a law administered by the Department:
>
> (1) A grant or loan of Federal financial assistance,
>      including funds made available for:
>
> > (i) The acquisition, construction, renovation,
> >      restoration, or repair of a building or facility or
> >      any portion thereof; and
> >
> > (ii) Scholarships, loans, grants, wages or other funds
> >      extended to any entity for payment to or on
> >      behalf of students admitted to that entity, or
> >      extended directly to such students for payment to
> >      that entity.
>
> (2) A grant of Federal real or personal property or any
>      interest therein, including surplus property, and the
>      proceeds of the sale or transfer of such property, if the
>      Federal share of the fair market value of the property is
>      not, upon such sale or transfer, properly accounted for
>      to the Federal Government.
>
> (3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

16.     Further, 34 C.F.R. § 106.71 provides, in pertinent part:

No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX or [its implementing regulations], or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in a[] [Title IX] investigation, proceeding, or hearing...

17.     For a recipient to retaliate in any way against an individual who has reported or complained pursuant to any right or privileged secured by Title IX is a violation of Title IX.

18.     The Supreme Court of the United States in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), recognized that a recipient of Federal financial assistance intentionally violates Title IX, and is subject to a private action for damages, where the recipient has actual notice of, and is "deliberately indifferent" to, acts of teacher-student sexual misconduct.

Applicable Westminster College Policy

19.     Defendant WESTMINSTER COLLEGE (hereinafter, the "College") has adopted a twelve-page Title IX Policy and an eight-page appendix to that policy titled Title IX Policy Procedures for Complaints.

20.     Specifically, and in pertinent part, the College's Title IX "Statement of Policy" found in Section 1. of its Title IX Policy provides:

> It is the policy of Westminster College ("the College") to provide a safe and non-discriminatory learning and working environment for all members of our campus community. The College does not discriminate based on sex in any of its education or employment programs and activities. To that end, this policy prohibits specific forms of behavior that violate Title IX of the Education Amendments of 1972 ("Title IX")...

> The College has adopted this policy with a commitment to: (1) eliminating, preventing, and addressing the effects of prohibited conduct as describe in section 2 of this policy (2) fostering the College's community of trust, in which prohibited conduct is not tolerated; (3) cultivating a climate where all individuals are well-informed and supported in reporting prohibited conduct; (4) providing a fair and impartial process for all parties; and (5) identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed.

21.     With respect to sexual harassment, the Section 3. of the College's Title IX policy defines the term as follows:

> Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the College's educational programs or activities. Includes quid pro quo harassment and hostile environment as well as sexual assault, stalking, dating violence and domestic violence.

22.     Further, with respect to retaliation, the Section 3. of the College's Title IX

policy defines the term as follows:

> Any adverse action taken against a person for making a
> good faith report of prohibited conduct or participating in
> any proceeding under this policy, including, but not limited
> to, threatening, intimidating, harassing, coercing, or any
> other conduct that would discourage a reasonable person
> from engaging in activity protected under this policy.

23.     Finally, Section 6. of the College's Title IX policy establishes the

responsibilities of mandatory reporters, stating:

> All staff and faculty except for employees in the Counseling
> Center and Student Health Services are designated as
> mandatory reporters. Mandatory reporters are required to
> report to the Title IX coordinator within 48 hours all
> relevant details obtained directly or indirectly about an
> incident of prohibited conduct that involves any student or
> employee.

## GENERAL ALLEGATIONS

24.     Plaintiff hereby repeats all of the allegations contained in the Complaint thus

far above and incorporates same as if fully set forth at length herein.

25.     Plaintiff, NAOMI KEHL (hereinafter, "Naomi"), is a student athlete on a full-

ride scholarship Defendant WESTMINSTER COLLEGE (hereinafter, the "College").

26.     Naomi has both academic and athletic scholarships.

27.     Her athletic scholarship is for women's soccer.

28.     As of this filing, she is a senior at the College.

29.     Naomi is a skilled goalkeeper who plays on the College's women's soccer team,

which is a NCAA Division II team that competes in the Rocky Mountain Athletic

Conference.

30.     As a freshman, Naomi regularly played at least half the game, sometimes started, and played the full game as goalkeeper on the College women's soccer team during the pre-season and conference games.

31.     Naomi played at least half the game in all but one of the pre-season games during fall season of her sophomore year.

32.     She played no minutes in only one game.

33.     Defendant Tony LeBlanc (hereinafter, "Coach LeBlanc") is head coach of the College's women's soccer team.

34.     The College receives federal financial assistance from the United States Department of Education ("Department").

35.     As a recipient of Department funds, the College must operate it education program and activities, including athletics, in a nondiscriminatory manner free of discrimination based on sex.

36.     As aforecited, Title IX of the Education Amendments of 1972, specifically, 20 U.S.C. § 1681(a), states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..."

37.     Key areas in which the College has obligations under Title IX include athletics and sex-based harassment, which encompasses sexual assault and other forms of sexual violence.

38.     As aforecited, under Title IX and its implementing regulations, no recipient of Department funds or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX or its implementing regulations, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in a proceeding under Title IX.

39.     Thus, for a recipient to retaliate in any way against an individual who has reported or complained pursuant to any right or privileged secured by Title IX is a violation of Title IX.

### *The "Hot Seat" and the Sexual Harassment and Abuse Advanced by Coach LeBlanc*

40.     This case involves female soccer players at Westminster College in Salt Lake City, Utah, ages 17 and older, who, in the presence and with the active participation of the Coach LeBlanc, were involved in and subjected to what is known as the "hot seat."

41.     The "hot seat" is an activity that, upon information and belief, has become an initiation ritual for both transfer and freshmen players on the College's women's soccer team, and has been for years.

42.     Specifically, while traveling on the team bus, upper class players require freshmen and transfer players to come to the front of the bus, one at a time, and to sit in what is characterized as the "hot seat."

43.    The "hot seat" is a seat directly across the aisle from, and adjacent to, Coach LeBlanc's seat.

44.    A spotlight is then shone on the player, and the player is required to answer sexually inappropriate and personally invasive questions posed by upper classmen into a microphone that broadcasts the player's answers throughout the team bus.

45.    In the presence of Coach LeBlanc, those in the "hot seat" are asked, and expected to answer, these highly offensive and intrusive questions about their personal sex lives, including explicit details about specific sexual conduct and activities, all while Coach LeBlanc is not only privy to this information by virtue of these "hot seat" sessions unfolding in his presence, but also with Coach LeBlanc himself actively participating in or engaging with these sexually explicit "hot seat" interrogations.

46.    Common "hot seat" questions include, without limitation:

- Do you spit or swallow the man's semen after giving him a blowjob?

- Have you had anal sex?

- How many sexual partners have you had?

- What is your favorite sexual position?

- What is the furthest you have gone sexually?

- "Theoretically," what is your favorite drug?

### *Plaintiff's Experience with the "Hot Seat"*

47.    In April 2021, Naomi was completing her freshman year at the College.

48.     On or about April 9, 2021, during spring soccer, the College's women's soccer team was traveling by bus to an out-of-state soccer match.

49.     On that date, Naomi and other freshmen and transfers, approximately ten (10) in total, were subjected to the "hot seat," as described above.

50.     Naomi felt trapped, was extraordinarily uncomfortable and distraught.

51.     Naomi became sick to her stomach as she anticipated being pressured to respond to questions no one should be compelled to answer publicly, particularly a young girl, and particularly in front of her male coach.

52.     Nonetheless, Naomi put on her "game face" and did her best to get through the experience without breaking down in front of her teammates and Coach LeBlanc, and without making eye contact with Coach LeBlanc as he observed and jokingly engaged in the harassment with the more senior players.

53.     Despite having full authority and opportunity at all times to do so, at no time did Coach LeBlanc terminate the "hot seat" initiation ritual, announce that the conduct was inappropriate, explain that such conduct constitutes sexual harassment and abuse, or otherwise put a stop to it, nor did he stop participating himself.

54.     He, instead, encouraged and participated in the conduct, allowing the bus for the team he coached to be a forum for sexual harassment and abuse to the young female athletes under his charge.

55.     One of Naomi's freshman teammates who was about to be subjected to the "hot seat" herself began to panic, and subsequently text-messaged her mother, asking what she should do.

56.     Without knowing the full extent or offensiveness of the sexually harassing questions asked, nor knowing of Coach LeBlanc's express approval of, and involvement in, the "hot seat" practice, this teammate's mother asked, "Where is Coach LeBlanc?", implying clearly that this "hot seat" activity was something Coach LeBlanc should obviously have been putting a stop to.

57.     Instead, the players were instructed, both by Coach LeBlanc and the more senior team members, that what happens on the bus stays on the bus, and that they were not to record the "hot seat" ritual on their cell phones.

***The College's Awareness of, and Deliberately Indifferent Response to, the Sexual Harassment and Abuse Advanced by Coach LeBlanc***

58.     On or about September 13, 2021 and again on September 16, 2021, non-party Ed Kehl ("Mr. Kehl"), Naomi's father, notified the College's Title IX Office as to the sexual harassment and abuse in which freshman student athletes, including specifically, Naomi, and transfer student athletes were being subjected to as alleged herein (hereinafter "the Sexual Harassment Complaint").

59.     Prior to formally submitting the Sexual Harassment Complaint, Mr. Kehl discussed the substance of the complaint with two members of the College's President's Cabinet – Kathryn Holmes, J.D. ("Ms. Holmes"), the College's General Counsel and Chief Risk Officer, and Glenn Smith, Ed.D ("Mr. Smith"), the College's Vice President for Student Affairs and Dean of Students.

60.     During Mr. Smith's discussion with Mr. Kehl, Mr. Smith commented that the sexual harassment and abuse reported by Mr. Kehl was "horrible" and that it is

"usually the tip of the iceberg" – suggesting, in other words, that this was only the sexual harassment and abuse that Mr. Kehl was then aware of, but that likely, there was further such conduct which Mr. Kehl was not aware of.

61.     Both Ms. Holmes and Mr. Smith, as cabinet members of the College's President's Counsel, had authority to take corrective action on behalf of the College to end the sexual harassment reported by Mr. Kehl.

62.     In a telephone conversation between Mr. Kehl and Ms. Holmes about the harassment and abuse described herein, Ms. Holmes advised Mr. Kehl of the available options for submitting a formal complaint, but advised, however, that Coach LeBlanc would know who submitted the complaint.

63.     Further, Ms. Holmes informed Mr. Kehl that if the school handled the complaint, Coach LeBlanc would probably only get "a slap on the wrist."

64.     In response to the options presented by Ms. Holmes, Mr. Kehl specifically stated that he did not want to submit a complaint anonymously and that he wanted to submit a formal Title IX complaint.

65.     Ms. Holmes advised Mr. Kehl about the process for filing a Title IX complaint, and Mr. Kehl proceeded to attempt to follow Ms. Holmes' instructions.

66.     Mr. Kehl had difficulty, however, uploading the written Sexual Harassment Complaint through the College's online Title IX complaint portal and advised Ms. Holmes of this fact in a text message exchange on September 17, 2021.

67. Ms. Holmes confirmed that a complaint had not been received through the Title IX portal and advised Ed as follows: "You can contact the Title IX office directly and ask for Mary at (801) 832-2946. She can help you get it filed."

68. Mr. Kehl followed Ms. Holmes' instructions and directly contacted Mary Royal ("Ms. Royal"), the College's Title IX Coordinator and Director of Equal Opportunity, who instructed him that he could simply email his Sexual Harassment Complaint to her for filing.

69. Mr. Kehl followed Ms. Royal's instructions and emailed the Sexual Harassment Complaint to her that same day.

70. Having followed all instructions provided by both Ms. Holmes and Ms. Royal, Mr. Kehl reasonably understood a formal Title IX complaint had been submitted to, and accepted by, the College's Title IX Office.

71. Unbeknownst to Mr. Kehl or Naomi herself, however, the College declined to handle the Sexual Harassment Complaint as a Title IX complaint and instead chose to handle it as an internal personnel matter.

72. On information and belief, the College chose to handle Mr. Kehl's complaint as a personnel matter and not a Title IX complaint because the College considered Mr. Kehl's report "anonymous" because it was submitted by a student's parent instead of the adult student herself.

73. The College, vis-à-vis Mr. Kehl's discussions with Kathryn Holmes, Glenn Smith, and Mary Royal, was fully aware that Mr. Kehl submitted the Sexual Harassment Complaint and that it was not being submitted anonymously.

74.    The College further understood that it was Mr. Kehl's express intention to submit the Sexual Harassment Complaint on behalf of his daughter, Naomi.

75.    Both Ms. Holmes and Ms. Royal were aware of Mr. Kehl's expressed desire to submit the Sexual Harassment Complaint to the Title IX Office as a formal Title IX complaint.

76.    Neither Ms. Holmes nor Ms. Royal advised Mr. Kehl that the College and its Title IX Office would consider a report submitted by Mr. Kehl to the College's Title IX Office a personnel matter and not a Title IX complaint by virtue of his submitting said Complaint, as opposed to his daughter submitting it herself.

77.    Both Ms. Holmes and Ms. Royal led Mr. Kehl to believe that the Sexual Harassment Complaint submitted by him to the College's Title IX Office would be accepted and handled as a formal Title IX complaint, consistent with his expressly verbalized wishes.

78.    In an email dated September 17, 2021, Ms. Royal acknowledged receipt of the Sexual Harassment Complaint submitted by Mr. Kehl and wrote the following in response: "Ed, Your Title IX Report has been received. We will be reviewing the report and contacting you regarding next steps."

79.    In another email exchange on September 17, 2021, between Mr. Kehl and Ms. Royal, Mr. Kehl confirmed in response to a direct inquiry from Ms. Royal that he did indeed want to "escalate" his report to a formal Title IX complaint.

80.     Neither Ms. Royal nor anyone else from the College or its Title IX Office advised Mr. Kehl that the College would not be addressing the Sexual Harassment Complaint as a Title IX matter.

81.     Ms. Holmes was aware of, and personally involved in, the College's response to the Sexual Harassment Complaint.

82.     The College retained outside counsel, Lauren Shurman ("Ms. Shurman"), a partner in the law firm Stoel Rives, to investigate the Sexual Harassment Complaint and the allegations contained therein.

83.     Ms. Shurman interviewed Naomi as part of the College's investigation.

84.     During said interview, Naomi specifically advised Ms. Shurman that she understood and believed that the "hot seat" ritual had been going on for years prior to the April 9, 2021, incident in which Naomi and others were personally subjected to such sexual harassment and abuse.

85.     As part of the investigation, Ms. Shurman interviewed the members of the College's women's soccer team who were freshman on or around April 9, 2021, but, on information and belief, did not interview students who were transfers at the time.

86.     On information and belief, Ms. Shurman did not interview any current or former members of the College's women's soccer team who were subjected to the "hot seat" in years prior to the April 9, 2021, incident.

87.     Coach LeBlanc was subsequently made aware of the Sexual Harassment Complaint submitted by Mr. Kehl, and knew that it was, therefore, Naomi's father who submitted it to the College's Title IX Office.

88.     During   the   College's   investigation,   Coach   LeBlanc   was   placed   on administrative leave for a short period of time and missed only the September 23, 2021 game.

89.     Upon information and belief, when asked during a coaches meeting for comment about Mr. Kehl's reporting of the sexual harassment and abuse, Coach LeBlanc commented that it was the dumbest thing he had ever heard, and it is so stupid.

90.     Shortly after Mr. Kehl first spoke with Ms. Holmes about the sexual harassment and abuse described herein, Ms. Holmes left Mr. Kehl a telephone voice message.

91.     In said voice message, Ms. Holmes reported that the College had concluded its investigation into the Sexual Harassment Complaint and would be requiring both student athletes and coaching staff of the College's women's soccer team to attend Title IX training.

92.     Ms. Holmes cited the nature of the matter being one involving personnel as the basis for not being able to share more information with Mr. Kehl about the College's investigation, the findings thereof, or corrective action taken by the College in response to the Sexual Harassment Complaint.

93.     Ms. Holmes' voice message was the first time anyone associated with the College put either Mr. Kehl or Naomi on notice that the College was handing the Sexual Harassment Complaint as a personnel matter, rather than as a Title IX matter, and as stated earlier, never had anyone, up to that time, explained to Mr.

Kehl or Naomi that the Sexual Harassment Complaint would be handled as a personnel matter as opposed to a Title IX matter.

94.     Later, Naomi did, in fact, attend the Title IX training required of the student athletes and coaching staff of the College's women's soccer team.

95.     The training, which consisted of a single meeting lasting around an hour, emphasized that the College took Title IX complaints very seriously – ironic, considering the College's willful failure to actually pursue the Sexual Harassment Complaint as a Title IX complaint, and considering Coach LeBlanc's comment that the Sexual Harassment Complaint was "the dumbest thing he had ever heard", and it is so stupid

### *Coach LeBlanc's Retaliation Against Naomi*

96.     Despite Coach LeBlanc's dismissive remarks regarding the Sexual Harassment Complaint, he was, evidently, sufficiently bothered by said Complaint that he then acted in retaliation against Naomi after the Sexual Harassment Complaint was submitted to, and accepted by, the College's Title IX Office.

97.     The chronology of events makes this fact clear.

98.     Prior to the submission of the Sexual Harassment Complaint to the Title IX Office, Naomi regularly played significant minutes in the women's team matches, alternating with the other goalkeeper on the team.

99.     After the Sexual Harassment Complaint was filed with the College's Title IX Office, and the cursory investigation was completed, and after Coach LeBlanc returned to his coaching position after the brief administrative leave he was placed

on by the College, he immediately proceeded to retaliate against Naomi by benching her in games.

100.   Naomi did not play a single minute for the next four matches after Coach LeBlanc returned, starting with the match on October 1, 2021 and continuing through to the match of October 10, 2021.

101.   The only intervening event of any significance between the time when Naomi played significant minutes in the matches and when she was repeatedly benched by Coach LeBlanc, was the filing of the Sexual Harassment Complaint against him.

102.   Thus, it seems clear that this theretofore unprecedented benching of Naomi by Coach LeBlanc was motivated directly and proximately out of a spiteful and malicious desire by Coach LeBlanc to retaliate against Naomi for the filing of the Sexual Harassment Complaint against him.

103.   As a result of this retaliation upon Naomi by Coach LeBlanc, on October 7, 2021, Mr. Kehl submitted a second complaint to the College's Title IX Office alleging retaliation against Naomi (the "Retaliation Complaint") for the previously submitted Sexual Harassment Complaint.

104.   The Retaliation Complaint put the College's Title IX Office on notice that Coach LeBlanc was retaliating against Naomi for the Sexual Harassment Complaint.

105.   In response to the submission of the Retaliation Complaint, Ms. Royal advised Mr. Kehl in an email dated that same day, October 7, 2021, that all correspondence going forward about the Retaliation Complaint "will need to be between the Title IX

team and Naomi" because of the legal requirements of the Family Educational Rights and Privacy Act ("FERPA").

106.    Prior to October 7, 2021, officials from the College, including specifically Ms. Holmes and Ms. Royal, communicated directly with Mr. Kehl regarding the Sexual Harassment Complaint filed on behalf of Naomi.

107.    At no time prior to October 7, 2021, did either Ms. Holmes or Ms. Royal inform Mr. Kehl that FERPA prohibited them from communicating directly with him about the Sexual Harassment Complaint.

108.    Ms. Royal emailed Naomi that same day, October 7, 2021, requesting a meeting with her to discuss the contents of the Retaliation Complaint.

109.    The following day, on Friday, October 8, 2021, legal counsel for Naomi sent a letter to Ms. Royal in response to her email from the day before, advising Ms. Royal that Naomi had retained counsel and that both they and Naomi would make themselves available for the interview requested by Ms. Royal in the coming week.

110.    Legal counsel for Naomi never received a reply from Ms. Royal herself or anyone else with the College's Title IX Office in response to this October 8, 2021 letter.

111.    Instead, on Monday, October 11, 2021, Ms. Holmes called counsel for Naomi and advised him that the College had retained its own counsel, and that said could would be in touch with Naomi's attorney to discuss the matter further.

112.    Ms. Shurman, the same attorney whom the College had retained to investigate the Sexual Harassment Complaint, subsequently contacted counsel for Naomi and

introduced herself as outside counsel for the College with respect to the Retaliation Complaint.

113.    Ms. Shurman advised Naomi's counsel that Ms. Royal wanted to meet with Naomi to provide information about her options going forward with respect to the Retaliation Complaint, but indicated that if Naomi wanted to have an attorney present for that meeting, then the College would also insist on having Ms. Shurman present for the meeting as well.

114.    The College has adopted a twelve-page Title IX Policy and an eight-page appendix to that policy titled Title IX Policy Procedures for Complaints.

115.    Nowhere in the College's Title IX Policy or appendices to that policy does the school put those who submit a Title IX complaint on notice that counsel retained by the College will be present in meetings between a complainant and representatives of the Title IX office to discuss Title IX violations.

116.    Interestingly, after the filing of the Retaliation Complaint, Coach LeBlanc then resumed giving Naomi playing time after benching her for four consecutive games immediately following the submission of the Sexual Harassment Complaint.

117.    Naomi declined to further purse a retaliation complaint through the College's Title IX administrative processes after realizing that the College and its Title IX Office was (a) taking an aggressive defensive legal posture in response to complaints of Title IX violations; (b) would not be following its own Title IX Policy with regard to those who would be participating in meetings to discuss the Retaliation Complaint; (c) had previously mislead Mr. Kehl concerning the acceptance and handling of the

Sexual Harassment Complaint as a Title IX complaint; and (d) had demonstrated a deliberately indifferent response to both the Sexual Harassment Complaint and Retaliation Complaint overall.

**COUNT I**
**VIOLATIONS OF TITLE IX – SEX-BASED DISCRIMINATION**
**As to Defendant Tony LeBlanc**
**(20 U.S.C. § 1681, *et seq.*)**

118.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

119.   The sex-based harassment and abuse articulated in Plaintiff's General Factual Allegations and perpetrated upon Plaintiff by Defendant Tony LeBlanc and constituted unwelcome conduct so severe, pervasive, and objectively offensive that it effectively denied Plaintiff equal access to the College's educational programs or activities, in that it created both a sexually harassing quid pro quo and a hostile environment.

120.   Specifically, the sexually harassing quid pro quo was the exchange, whereby, freshman and transfer players on College's women's soccer team, such as Plaintiff, were expected to participate in the aforedescribed "hot seat" initiation ritual, and in exchange, were therefore permitted to play on the team and not be subjected to retaliation by Coach LeBlanc for not participating.

121.   Additionally, this sexually explicit and wildly inappropriate "hot seat" initiation ritual created a high-pressure, objectively offensive, and hostile environment on the soccer team's bus.

122.   As aforedescribed herein, Coach LeBlanc knowingly and willfully created, permitted, advanced, encouraged, and even participated in, the sexual harassment and abuse posed by the "hot seat" ritual, and further, subjected the young female athletes in his charge to this sexually inappropriate and abusive conduct, in violation of both Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX") and the College's own Title IX policy as aforecited herein.

123.   Coach LeBlanc, having both directly witnessed and even participated in this sexually harassing and abusive conduct clearly had actual knowledge of the ongoing sexual harassment posed by the "hot seat" ritual, and more specifically, of the sexual harassment Plaintiff herself was subjected to as a result of said ritual.

124.   Despite this knowledge, Coach LeBlanc failed to take immediate, reasonable, effective remedial steps to resolve the sexual harassment and abuse posed by the "hot seat" ritual, especially given that he had an obligation to do so under the College's Title IX policy as a mandatory reporter.

125.   In other words, Coach LeBlanc persisted in his inaction, even after he had actual knowledge of the ongoing sexual harassment posed by the "hot seat" ritual, and even despite the duty placed upon him to affirmatively act in response to his knowledge of this prohibited conduct.

126.   Thus, through the unwelcomed, severe, pervasive, and objectively offensive conduct which Coach LeBlanc knowingly and willfully created, permitted, advanced, encouraged, and even participated in, he fostered a sexually-charged and grossly

hostile environment, and subjected the young female athletes in his charge to said environment, as a quid pro quo prerequisite to participation on his soccer team.

127.   As a direct and proximate result of the sexually harassing, abusive, and exploitative conduct of Coach LeBlanc as herein described, Plaintiff has suffered significant damages, including, but not limited to, extreme emotional distress and/or psychological damage, and further, her character and standing in her community has suffered.

## COUNT II
## VIOLATIONS OF TITLE IX – RETALIATION
### As to Defendant Tony LeBlanc
### (20 U.S.C. § 1681, *et seq.* & 34 CFR § 106.71)

128.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

129.   As cited earlier herein, Title IX's implementing regulations, specifically, 34 CFR § 106.71, prohibiting retaliation, provides in pertinent part as follows:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX or [its implementing regulations], *or because the individual has made a report or complaint*, testified, assisted, or participated or refused to participate in a[] [Title IX] investigation, proceeding, or hearing...

> (Emphasis added)

130.   Coach LeBlanc actively retaliated against Plaintiff as a direct consequence of Plaintiff's filing of the Sexual Harassment Complaint to the College's Title IX Office, in violation of Title IX and 34 CFR § 106.71.

131. Specifically, prior to the submission of the Sexual Harassment Complaint to the Title IX Office, Plaintiff regularly played significant minutes in the College's women's soccer team's matches, alternating with the other goalkeeper on the team.

132. After the Sexual Harassment Complaint was filed with the College's Title IX Office and the cursory investigation was completed, and after Coach LeBlanc returned to his coaching position after the brief administrative leave he was placed on by the College, he immediately proceeded to retaliate against Plaintiff by benching her in games.

133. Plaintiff did not play a single minute for the next four matches after Coach LeBlanc returned, starting with the match on October 1, 2021 and continuing through to the match of October 10, 2021.

134. The only intervening event of any significance between the time when Plaintiff played significant minutes in the matches and when she was repeatedly benched by Coach LeBlanc, was the filing of the Sexual Harassment Complaint against him.

135. Thus, it seems clear that this theretofore unprecedented benching of Plaintiff by Coach LeBlanc was motivated directly and proximately out of a spiteful, malicious, and discriminatory desire by Coach LeBlanc to retaliate against Plaintiff for the filing of the Sexual Harassment Complaint against him.

136. As a result of this discriminatory retaliation upon Plaintiff by Coach LeBlanc, on October 7, 2021, Mr. Kehl submitted a second complaint (the "Retaliation Complaint") to the College's Title IX Office alleging retaliation against Plaintiff by Coach LeBlanc for the previously submitted Sexual Harassment Complaint.

137.    The Retaliation Complaint put the College's Title IX Office on notice that Coach LeBlanc was retaliating against Plaintiff for the Sexual Harassment Complaint.

138.    Interestingly, after the filing of the Retaliation Complaint, Coach LeBlanc then resumed giving Plaintiff playing time after having benched her for four consecutive games immediately following the submission of the Sexual Harassment Complaint.

139.    The filing of both the Sexual Harassment Complaint and the Retaliation Complaint were protected activities which Plaintiff was entitled to undertake.

140.    It is clear that the filing of these complaints was not only the motivating factor which caused Coach LeBlanc to take adverse action against Plaintiff in the form of repeatedly benching her, but it seems entirely likely that but-for these complaints having been filed, the adverse action perpetrated against Plaintiff by Coach LeBlanc would not have occurred.

141.    This is evidenced by both the short temporal proximity between the protected activity and the adverse action, as well as the lack of a significant intervening alternative explanation for the adverse action.

142.    Thus, Coach LeBlanc clearly violated not only Title IX's prohibition on retaliation as arising under 34 CFR § 106.71, but additionally, he violated the College's own prohibition on such retaliatory conduct.

143.    As cited earlier herein, with respect to retaliation, the Section 3. of the College's Title IX policy defines the term as follows:

> *Any adverse action* taken against a person *for making a good faith report of prohibited conduct* or participating in any proceeding under this policy, including, but not limited to, threatening, intimidating, harassing, coercing, or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy.

(Emphasis added)

144. Again, the sequence of events as outlined herein make clear that Coach LeBlanc did exactly this – with him having taken adverse against Plaintiff for making a good faith report to the College of his prohibited conduct.

145. As a direct and proximate result of Coach LeBlanc's prohibited retaliatory conduct perpetrated against Plaintiff as herein described, Plaintiff has suffered significant damages, including, but not limited to, extreme emotional distress and/or psychological damage, and further, her character and standing in her community has suffered.

**COUNT III**
**<u>VIOLATIONS OF TITLE IX – DELIBERATE INDIFFERENCE</u>**
**As to Defendant Westminster College**
**(20 U.S.C. § 1681, *et seq.*)**

146. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

147. Defendant Westminster College (the "College") advanced the exclusion of Plaintiff from participation in, denied Plaintiff the benefits of, or subjected Plaintiff to, sex-based discrimination, harassment, and abuse, in its women's soccer athletics program through its deliberately indifferent response to the sexually harassing and

abusive conduct of Coach LeBlanc, in violation of both Title IX and its own Title IX policies.

148.   Specifically, the College, as a recipient of federal funds, had a duty to ensure that Plaintiff was not deprived of access to the educational benefits or opportunities provided by the College on the basis of sex, and in such an event, had a further duty to properly intervene, investigate, and protect Plaintiff by putting a stop to Coach LeBlanc's prohibited conducted.

149.   As stated earlier herein, the College, in its own Title IX "Statement of Policy" found in Section 1. of its Title IX Policy, claims that the College is committed to:

> (1) eliminating, preventing, and addressing the effects of prohibited conduct as describe in section 2 of this policy;
> (2) fostering the College's community of trust, in which prohibited conduct is not tolerated;
> (3) cultivating a climate where all individuals are well-informed and supported in reporting prohibited conduct;
> (4) providing a fair and impartial process for all parties; and
> (5) identifying the standards by which violations of this policy will be evaluated and disciplinary action may be imposed.

150.   Put simply, the College has failed with respect to its purported commitments vis-à-vis Title IX.

151.   Specifically, College officials with authority to take corrective action to eliminate, prevent, or address the effects of prohibited sexual harassment have acted with deliberate indifference to both the Sexual Harassment Complaint and the Retaliation Complaint filed by Plaintiff, by, among other things, failing to conduct a thorough investigation of the longstanding sexual harassment permitted by, and at

times, participated in, by Coach LeBlanc, and further, by failing to take reasonable action to stop the harassment and retaliation, thus leaving Plaintiff and other members of the College's women's soccer team vulnerable to continued harassment, abuse, and retaliation, of which the College had actual knowledge.

152.   The College's response to the sexual harassment and retaliation described herein has been minimalist and unreasonable, particularly given the nature and duration of the sexual harassment that was allowed by, and at times, participated in, by Coach LeBlanc, in addition to his subsequent retaliation against Plaintiff.

153.   Specifically, the College's treatment of the Sexual Harassment Complaint as a personnel matter after accepting it as a Title IX complaint was misleading and evidenced an effort to sidestep its Title IX obligations under its formal Title IX Complaint procedure.

154.   Additionally, the College's investigation of the Sexual Harassment Complaint was woefully inadequate as alleged herein.

155.   Furthermore, the disciplinary action taken by the College against Coach LeBlanc following its meager investigation of the Sexual Harassment Complaint – placing him on a brief administrative leave causing him to miss only one game – was ineffective in remediating the sexual harassment and abuse, as alleged herein.

156.   Further still, the College's handling of the Retaliation Complaint was inconsistent with the College's own Title IX policies and procedures.

157.   Finally, the College's failure to take any action against Coach LeBlanc for his clear retaliation against Plaintiff is manifestly unreasonable.

158.   Thus, the College and its constituent employees, agents, and/or workmen, engaged in a pattern and practice of behavior demonstrating deliberate indifference towards the deprivation of the educational opportunities or benefits to which Plaintiff otherwise entitled, vis-à-vis her equal access to the College's women's soccer team.

159.   As a direct and proximate result of the College's deliberate indifference to the unwelcomed, severe, pervasive, and objectively offensive conduct which Coach LeBlanc knowingly and willfully created, permitted, advanced, encouraged, and even participated in, Plaintiff has suffered significant damages, including, but not limited to, extreme emotional distress and/or psychological damage, and further, her character and standing in her community has suffered.

**COUNT IV**
**VIOLATIONS OF 34 CFR § 106.41**
**As to Defendant Tony LeBlanc**

160.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

161.   34 CFR § 106.41 provides in pertinent part that:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

162.   As articulated more fully in Count II hereof, which Plaintiff specifically realleges and incorporates by reference here, Coach LeBlanc, on the basis of Plaintiff's sex and as a direct result of her filing of the Sexual Harassment Complaint

against him, purposefully excluded Plaintiff from participation in, denied Plaintiff the benefit of, and treated Plaintiff differently from other persons with respect to the College's women's soccer team, which, theretofore, she has regularly been permitted to participate in.

163.   Thus, Coach LeBlanc violated Plaintiff's rights as arising under 34 CFR § 106.41, given that the harm perpetrated by Coach LeBlanc is of the precise nature 34 CFR § 106.41 was intended to prevent, and further, that Plaintiff is within the precise class of individuals whom 34 CFR § 106.41 was intended to protect.

164.   As a direct and proximate result of Coach LeBlanc's knowing and willful conduct in violation of 34 CFR § 106.41, Plaintiff has suffered significant damages, including, but not limited to, extreme emotional distress and/or psychological damage, and further, her character and standing in her community has suffered.

### COUNT V
### GROSS NEGLIGENCE
### As to Defendant Tony LeBlanc

165.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

166.   Coach LeBlanc had a duty, whether arising under common law, Title IX, its implementing regulations, or the College's own Title IX policies, as aforecited herein, to refrain from engaging in sexually harassing, abusive, or exploitative conduct which is prohibited by any of those aforementioned sources of law or policy.

167.    Further, given that Coach LeBlanc was Plaintiff's coach at the time he engaged in this tortious and prohibited conduct, a special relationship existed between Coach LeBlanc and Plaintiff which gave rise to a heightened duty of care.

168.    Coach LeBlanc, nonetheless, violated his duty of care as owed to Plaintiff, in that he repeatedly engaged in conduct which was prohibited by those aforementioned sources of law or policy.

169.    Specifically, and among other things:

   a.  Coach LeBlanc engaged in sexual harassment, abuse, and exploitation, by creating, permitting, advancing, encouraging, and even participating in, the "hot seat" initiation ritual;

   b.  Coach LeBlanc thereby fostered a sexually-charged and grossly hostile environment which he subjected the young female athletes in his charge to;

   c.  further, Coach LeBlanc thereby created a quid pro quo prerequisite to participation on his soccer team through the "hot seat" initiation ritual;

   d.  further, Coach LeBlanc, despite his obligation as a mandatory reporter, failed to report the ongoing sexual harassment, abuse, and exploitation which he, himself, created, permitted, advanced, encouraged, and even participated in; and

   e.  finally, Coach LeBlanc then retaliated against Plaintiff by taking adverse action against her in connection with her participation in his athletic program, directly as a result of Plaintiff's engaging in the

protected activity of filing a Title IX complaint against him in connection with the aforesaid prohibited conduct.

170.   But-for Coach LeBlanc engaging in the prohibited conduct enumerated in subparts a. through e. above, Plaintiff's harm would not have occurred.

171.   Further, it is reasonably foreseeable that a collegiate women's soccer coach similarly situated to Coach LeBlanc who engages in the same or similar conduct to that prohibited conduct which Coach LeBlanc himself engaged in, is reasonably likely to cause harm to his female players, as was Plaintiff's case herein.

172.   Thus, as a direct and proximate result of Coach LeBlanc's negligent conduct, the severity of which rises to gross negligence in willful and/or wanton disregard for his duty to the contrary, Plaintiff has suffered significant damages, including, but not limited to, extreme emotional distress and/or psychological damage, and further, her character and standing in her community has suffered.

173.   Should the Court find that Coach LeBlanc's conduct does not rise to the level of gross negligence, however, Plaintiff alternatively pleads a claim for simple negligence in this Count.

**COUNT VI**
**GROSS NEGLIGENCE**
**As to Defendant Westminster College**

174.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

175.   Defendant Westminster College, (hereinafter, the "College") had a duty, whether arising under common law, Title IX, its implementing regulations, or the

College's own Title IX policies, as aforecited herein, to adhere to provisions contained in these sources of law and refrain from engaging in conduct which manifested the College's deliberate indifference to genuine student complaints of sexual harassment or sex-based retaliation.

176.   Further, given that the College was Plaintiff's university at the time Coach LeBlanc perpetrated his tortious and prohibited conduct, a special relationship existed between the College and Plaintiff which gave rise to a heightened duty of care, given that Plaintiff was a student in the College's charge.

177.   The College, nonetheless, violated its duty of care as owed to Plaintiff, in that:

     a.  the College sidestepped its legal obligations under Title IX by treating the Sexual Harassment Complaint as a personnel matter after accepting it as a Title IX complaint;

     b.  the College's investigation of the Sexual Harassment Complaint was inadequate given the actual knowledge the College had about the severity and duration of the misconduct over a number of years;

     c.  the College's imposition of just a short period of administrative leave on Coach LeBlanc only while the College investigated the Sexual Harassment Complaint was not a reasonable or proportionate response given Coach LeBlanc's knowledge and permission of, and at times, participation in, the "hot seat" ritual which directly subjected Plaintiff and others to sexual harassment which he had a heightened duty in his capacity as their teacher and coach to prevent;

    d.   the College's Title IX training conducted in response to the Sexual Harassment Complaint was not a reasonable response under the circumstances and was insufficient to stop the longstanding sexual harassment;

    e.   further, this Title IX training was an insincere gesture by the College to appear as though it was taking Plaintiff's matter serious, when in fact, it purposefully treated Plaintiff's genuine complaint of sexual harassment and abuse as a personnel matter after accepting it as a formal Title IX complaint; and finally,

    f.   the Title IX training conducted by the College in response to the Sexual Harassment Complaint was ineffective, as evidenced by the response from an assistant coach on the women's soccer team to an inquiry about the status of the "hot seat" ritual going forward, when said assistant coach remarked that student athletes would have to be given an option to decline participation in the ritual if it was ever to be conducted again – rather than eliminating the wildly inappropriate and prohibited conduct completely.

178.   In short, College officials with authority to take corrective action were put on actual notice both of Coach LeBlanc prohibited sexually harassing conduct, and his subsequent retaliation, and failed in both instances to take appropriate action to stop or prevent further action by Coach LeBlanc, including, but not limited to, failing to

terminate him, and were otherwise deliberately indifferent as articulated more fully elsewhere herein.

179.   But-for the College's negligent failures as enumerated in subparts a. through f. above, Plaintiff's harm would not have occurred.

180.   Further, it is reasonably foreseeable that a college which disregards, fails to take seriously, or fails to properly and adequately handle a genuine Title IX complaint, and which otherwise manifests an attitude of deliberate indifference thereto, is reasonably likely to cause harm to its female students and student athletes, as was Plaintiff's case herein.

181.   Thus, as a direct and proximate result of the College's negligent conduct as aforesaid, the severity of which rises to gross negligence in willful and/or wanton disregard for its duty to the contrary, Plaintiff has suffered significant damages, including, but not limited to, extreme emotional distress and/or psychological damage, and further, her character and standing in her community has suffered.

182.   Should the Court find that the College's conduct does not rise to the level of gross negligence, however, Plaintiff alternatively pleads a claim for simple negligence in this Count.

### COUNT VII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### As to Defendant Tony LeBlanc

183.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

184.   Coach LeBlanc engaged in outrageous and intolerable conduct toward Plaintiff, as articulated more fully elsewhere herein.

185.   In so doing, Coach LeBlanc intended to cause Plaintiff emotional distress or acted with reckless disregard of the probability of causing Plaintiff emotional distress.

186.   Plaintiff suffered and continues to suffer severe or extreme emotional distress as a direct and proximate result of Coach LeBlanc's conduct.

187.   Plaintiff suffered and continues to suffer health, physical and psychological injuries as a direct and proximate result of Coach LeBlanc's conduct.

188.   Plaintiff has incurred and will continue to incur medical and psychological expenses as a direct and proximate result of Coach LeBlanc's outrageous and intolerable conduct.

189.   Plaintiff has suffered and continues to suffer interference with continuing education and lost educational time as a direct and proximate result of Coach LeBlanc's conduct.

190.   Plaintiff has suffered and continues to suffer impaired educational opportunity and capacity as a direct and proximate result of Coach LeBlanc's conduct.

191.   Plaintiff has incurred and continue to incur legal fees and costs by being a victim of Coach LeBlanc's outrageous and intolerable conduct, and through pursuit of the herein action arising therefrom.

192.   Given that Coach LeBlanc intentionally engages in conduct towards Plaintiff that was outrageous and intolerable in that it offends the generally accepted

standards of decency and morality, and further, that he did so with the clear intention and purpose of inflicting emotional distress and knew, or should have known, that such emotional distress would result, the fact that such severe emotional distress did, then, result therefrom, entitles Plaintiff to an award of punitive or exemplary damages in an amount to be determined at trial.

**COUNT VIII**
**<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>**
**As to Defendant Westminster College**

193.  Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

194.  Defendant Westminster College, (hereinafter, the "College") had a duty, as aforesaid, whether arising under common law, Title IX, its implementing regulations, or the College's own Title IX policies, as aforecited herein, to adhere to provisions contained in these sources of law and refrain from engaging in conduct which manifested the College's deliberate indifference to genuine student complaints of sexual harassment or sex-based retaliation.

195.  Further, given that the College was Plaintiff's university at the time Coach LeBlanc perpetrated his tortious and prohibited conduct, a special relationship existed between the College and Plaintiff which gave rise to a heightened duty of care, given that Plaintiff was a student in the College's charge.

196.  The College nonetheless breached the duty of care it owed to Plaintiff herein, as more fully articulated in Count VI, which Plaintiff expressly realleges and incorporates by reference here.

197.   As a direct and proximate result of the College's negligent failures in breach of its owed duty of care to Plaintiff, Plaintiff was caused to suffer, and continues to suffer, severe or extreme emotional distress; as well as health, physical and psychological injuries which are manifested by objective symptomology.

198.   Given the severity of the harm which the College's negligent failures caused Plaintiff to be subjected to, any reasonable person in Plaintiff's position would have suffered similar emotion distress under the circumstances.

199.   Given the College's negligent failure to prevent such injury, despite the College's actual knowledge or, at least constructive knowledge that such emotional distress would likely result, the fact that such severe emotional distress did, then, result therefrom, entitles Plaintiff to an award of punitive or exemplary damages in an amount to be determined at trial.

**COUNT IX**
**NEGLIGENCE – *RESPONDEAT SUPERIOR***
**As to Defendant Westminster College**

200.   Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs as if fully stated herein.

201.   At all times relevant herein, Coach LeBlanc, while engaging in the sexually harassing and otherwise prohibited conduct as aforesaid, was acting within the course and scope of his employment with the College.

202.   The College is therefore vicariously liable for the negligent and otherwise tortious conduct of Coach LeBlanc, its employee, agent, and or workman, pursuant to

the principles of *respondeat superior*, agency, master-servant relationship, contribution, and/or indemnification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, NAOMI KEHL, demands judgment against Defendants, TONY LEBLANC and WESTMINSTER COLLEGE, for the following damages:

I.      For judgement against the Defendants jointly, severally, and alternatively, for general, compensatory, and punitive damages, with interest;

II.     Reasonable attorney's fees and costs of suit pursuant to 18 U.S.C. 2255; and

III.    For such other further relief as the Court may deem equitable and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: <u>March 7, 2023</u>            LENTO LAW GROUP, P.C.

SAMUEL ROCERETA, ESQUIRE
UT State Bar No. 18528
2150 South 1300 East - Suite 500
Salt Lake City, UT 84106
385.479.3200 (Office)
385.479.3201 (Fax)
srocereta@lentolawgroup.com
*Attorney for Plaintiff*
TRIAL COUNSEL

Dated: <u>March 7, 2023</u>          LENTO LAW GROUP, P.C.

_____
JOSEPH CANNIZZO JR., ESQ.
AL State Bar No. 3584O57X
(*Pro Hac Vice Admission to be applied for*)
Chase Corporate Center
1 Chase Corporate Center, Suite 400
Birmingham, AL 35244
jcannizzo@lentolawgroup.com
Phone: 385-485-0600
Fax: 313-992-1122